**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VINCENT WADLINGTON, | ) |
| Petitioner, | ) |
| v. | ) Civil Action No. 15-10468-DJC |
| LISA MITCHELL, | ) |
| Respondent. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                              **January 29, 2019**

### I.    Introduction

Petitioner Vincent Wadlington ("Wadlington") has filed a petition seeking a writ of habeas corpus ("Petition") pursuant to 28 U.S.C. § 2254.  D. 1.  Respondent Lisa Mitchell, Superintendent of the Massachusetts Department of Corrections, opposes the Petition on the grounds that Wadlington's claims either fail on the merits or are procedurally defaulted.  For the reasons stated below, the Court DENIES the Petition.

### II.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires this Court to review the Petition to determine whether the state court adjudication either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

"Clearly established federal law" for the purposes of § 2254(d) "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). State court decisions are "contrary to" clearly established Supreme Court precedent if they either "appl[y] a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confront[] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[] at a result different from [Supreme Court] precedent." Williams, 529 U.S. at 405-06. State court decisions involve an "unreasonable application" of clearly established federal law if they "correctly identif[y] the governing legal rule but appl[y] it unreasonably to the facts of a particular prisoner's case." Id. at 407-08.

For the purposes of § 2254(d)(2), any factual determinations made by a state court are "presumed to be correct" unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

## III.    Relevant Factual Background

Unless otherwise noted, the following facts are drawn from the Bristol Superior Court's rulings denying Wadlington's suppression motions and motion for a new trial, the trial transcripts for Wadlington's trial and the opinion of the Supreme Judicial Court affirming Wadlington's convictions on appeal.

## A. **The Commission of the Crimes**

Shortly before Christmas in 2005, Wadlington met William Fields and Leslie Cole through a mutual acquaintance. S.A. 94, 791.[1] Fields and Cole had been planning a robbery, but their efforts were hindered because they lacked a firearm. S.A. 94. The mutual acquaintance introduced Fields and Cole to Wadlington because she knew Wadlington possessed a gun. S.A. 791. The mutual acquaintance knew Wadlington only as "Blue" and introduced him as such to Fields and Cole. S.A. 94. On December 24, 2005 the three "devised a plan to rob a drug dealer's home." S.A. 791. To execute this plan, they travelled in Cole's car to Brockton, where they acquired a .22 caliber rifle, and then to a residence in New Bedford, where they acquired dark clothing to wear during the robbery. S.A. 791. Shortly before midnight, the trio travelled to the apartment of Christopher Busby ("Busby") in New Bedford, which would be the target of their armed robbery. S.A. 791. Busby was there with Rudolph Santos, Busby's friend, when Wadlington, Cole and Fields approached his apartment's back door. S.A. 791. Although Busby initially denied them entry, he eventually opened the door, at which point the three were able to force themselves inside, after which a fight broke out. S.A. 94, 791.

Cole and Fields began to fight with Busby as Wadlington fought with Santos. S.A. 791. Shortly after the fight began, Fields returned to Cole's car, "drove to a nearby house where he knew the occupants and told them to call the police because he heard gunshots."[2] S.A. 792. While Fields was gone, Wadlington and Cole acquired the keys to the house's cellar from Santos, despite Busby's effort to stop them by wounding Cole with a samurai sword. S.A. 792. One of the men

---

[1] The Supplemental Answer ("S.A.") was filed by manually. D. 53.

[2] The Supreme Judicial Court noted that "William Fields testified that he had not heard gunshots but told his acquaintance that he had in the hope that [the acquaintance] would notify the police, and that the police would quickly respond and stop the fighting." S.A. 792.

then went down to the cellar, presumably to look for drugs, but came upstairs to ask "[w]here is it? [w]here is it?" S.A. 792; S.A. 94. Busby then recalled hearing was a gunshot. S.A. 792. Fields eventually returned and the three men fled by foot. S.A. 792.

Police arrived at the scene shortly before 1:00 a.m., where they found Santos dead and Busby covered in blood with a black sheath to a sword lying next to him. S.A. 792. Busby survived the attack, but suffered from multiple puncture wounds. S.A. 792. Two days after the robbery, Fields and Cole drove to the ocean, where they discarded the samurai sword and the clothes Cole had worn during the crime. S.A. 792.

### B.  The Police Investigation

Following the crime, Trooper Scott A. Flaherty conducted a series of interviews, the results of which he conveyed through his affidavit in support of a search warrant of the residence of Wadlington's girlfriend's residence in New Bedford. S.A. 618-26. He attested to the substance of these interviews in his affidavit. Id. Among other things, he attested in his affidavit that Fields told him that "after formulating their plan on the evening of December 24, 2005, to commit the robbery, he, Cole, and [Wadlington] traveled in Cole's automobile to a home on County Street in New Bedford that he believed was the residence of [Wadlington's] girl friend" and retrieved the sawed-off rifle. S.A. 795. (Later, prior to trial, Fields would assert that they had traveled to a residence in New Bedford where Wadlington had retrieved the firearm, S.A. 795).

Wadlington spoke to officers investigating the robbery and murder on January 12, 2006, while he was in custody at the Plymouth House of Correction for an unrelated motor vehicle charge. S.A. 109. Before the interview, a corrections officer informed Wadlington that two police officers wished to speak with him. S.A. 110. Further, the corrections officer told Wadlington that he would hear his Miranda rights first and that Wadlington could speak to the officers if he wanted

to but did not have to.  S.A. 110.  Before speaking with the officers, Wadlington was informed of his <u>Miranda</u> rights orally and through a written form.  S.A. 110-11; S.A. 794.  The police also advised him of his <u>Miranda</u> rights, and presented Wadlington with a consent form, which included a "fifth" <u>Miranda</u> warning, that provided, "[i]f you decide to answer questions, you may stop at any time to consult with a lawyer."  S.A. 119.  Wadlington signed the portion of the consent form that indicated he had been informed of his <u>Miranda</u> rights but refused to sign the part of the consent form which indicated he had not been coerced into signing it.  S.A. 794-95.

Once the interview started, Wadlington repeatedly asked the officers what prompted their visit and what they were interviewing him about.  S.A. 112.  Eventually, the police showed Wadlington pictures of Busby and Santos and asked whether Wadlington knew either, to which Wadlington responded that he did not.  S.A. 112-13.  An officer then explained that there had been a drug theft which had resulted in one victim's death and another's injury by stab wounds.  S.A. 113.  He further explained that he knew that Cole, Wadlington and a third man gathered on Christmas Eve on North Street, after which the men entered Cole's  car and drove to get the gun and then to Hillman Street.  S.A. 113.  In the interview, Wadlington "denied any involvement in the killing and denied knowing Cole."  S.A. 792-93.  He claimed to have been "at home with his girl friend," Janelle Morales, on the night of the incident.  S.A. 793.  Before the interview ended, the officers contacted Morales who would not corroborate Wadlington's alibi, at which point Wadlington invoked his right to stop answering questions by asking, "[c]an I please leave without my lawyer being present?"  S.A. 114.

## C.  <u>Wadlington is Charged and His Pretrial and Trial Proceedings</u>

Wadlington was indicted on March 3, 2006, on charges of first degree murder, assault with intent to murder, assault with a dangerous weapon, armed robbery and armed home invasion. S.A. 5; S.A. 364. Wadlington moved to suppress the statements he made to police on January 12, 2006. S.A. 108. The trial court noted that "the so-called fifth <u>Miranda</u> warning" in the written consent form "improperly qualified Wadlington's right to stop questioning at any time by tying that right to Wadlington's consultations with a lawyer." S.A. 119. Wadlington conceded that he understood his rights, but argued that his waiver of his <u>Miranda</u> rights was not knowing and voluntary. S.A. 119. The trial court concluded that Wadlington's waiver was voluntary, because Wadlington demonstrated throughout the interview that he desired to learn more about what the officers were investigating and knew the only way to gain such knowledge was by talking to them. S.A. 120. Thus, the trial court suppressed the statements Wadlington made after he asked to leave without his lawyer being present, but declined to suppress the statements he made before this request. S.A. 120, 123, 793.

Wadlington also moved to suppress the evidence obtained pursuant to the execution of search warrant on his girlfriend's residence. He argued that there was "an insufficient showing of probable cause that evidence of a crime would be found at the place to be searched." S.A. 127. The trial court denied this motion as well. S.A. 127. The court held that "[t]he affidavit here set forth sufficient facts connecting the defendant to [this residence] and established probable cause that evidence of the homicide would be located therein." S.A. 130. It based this ruling on the finding that Wadlington had been "placed at his residence the night of the crime, where he retrieved a sawed-off rifle that was identified by Busby and Fields as being present during the robbery." S.A. 130. Although Wadlington's location after the murder was unknown, the court concluded that it was reasonable to believe that he would have returned to his home with the murder weapon,

particularly considering that the murder weapon had been retrieved from that location.  S.A. 130-31.

Before trial, Fields changed his story by stating "they had actually traveled to, and the defendant retrieved a firearm from, a residence in Brockton," not New Bedford as he had originally asserted to police.  S.A. 623, 795.  Within a month of Fields changing his statement, the prosecution sent notice to Wadlington's counsel.  S.A. 795; S.A. 555.  The prosecution reminded the attorney of this disclosure in March 2010, six weeks before trial, when defense counsel filed a motion for discovery.  S.A. 796; S.A. 559.

Wadlington's jury trial began on May 10, 2010.  S.A. 91.  In its opening statement, among other things, the government told the jury that blood had been collected from the scene of the crime and from Cole's car and that both samples matched Wadlington's DNA profile.  T. Tr. I: 73.[3]  The prosecution also told the jury that analysis done on a palm print found in the cellar would trace back to Wadlington.  T. Tr. I: 73.  At trial, Sergeant Kerri Gilpin, the fingerprint evidence analyst, testified as to the similarity between a palm print found at the scene of the crime and the known palm print of Wadlington.  S.A. 792.  She testified that, "in [her] opinion, the latent and the known print were made by the same donor."  Id.  On cross-examination, Gilpin was asked how many "matching 'lines' of friction ridges she needed to find before she could form an opinion," and specifically if eight lines would be enough.  S.A. 798.  Gilpin responded that the determination ultimately depends on "the totality of the information" but she would not be personally comfortable making a determination on such a low number of matching lines and that she "would never want to put an innocent person in jail."  Id.  Amy Joy, the DNA analyst, compared a DNA

---

[3]The trial transcripts, referred to as "T. Tr." and by the day of the trial, are contained in the S.A., D. 53.

profile "from a swab taken from a 'red-brown drop' on the cellar stairs . . . with the known DNA profile of [Wadlington]." S.A. 792. Joy also compared the known DNA profile of Wadlington, who is African American, with another sample taken from a red-brown stain located in Cole's car. Id. For each comparison to Wadlington's known DNA profile, Joy testified that each sample was consistent with his DNA profile and that "the probability of a randomly selected African-American having the same DNA profile is one in 3.782 quintillion." Id.

Wadlington also testified at trial. S.A. 793. At trial, Wadlington stated that, on December 24, "he was in Brockton delivering Christmas presents to his aunt and visiting his father in a nursing home, and that he returned home around midnight." Id. He said he had never been in the residence where the killing occurred" nor had he ever met Cole or been in his car. Id. This testimony differs from the statement Wadlington had originally given the police on January 12, 2006, in which he claimed to have been at home all night with his girlfriend, id., an inconsistency that the Commonwealth pointed out in its cross-examination of him. S.A. 96.

During its closing argument, the government summarized the evidence and, among other things, argued that "[a] drug dealer, drug user or not, 19-year-old Rudolph Santos was left to die on the floor by [Wadlington] and Leslie Cole, that's what really happened, ladies and gentlemen." S.A. 739.

The jury was not given an unanimity instruction regarding either the identity of the victim of armed robbery or the underlying felony which served as the basis for the felony murder charge as part of the jury charge. S.A. 799. Wadlington's attorney did not object to the absence of either. Id. Additionally, the jury was instructed to find Wadlington guilty of felony murder if it found he had committed a felony inherently dangerous to human life and that the felonies of armed robbery and armed home invasion are inherently dangerous to human life. S.A. 799-00.

On May 20, 2010, the jury returned a guilty verdict on the charges of first-degree murder (on theories of deliberate premeditation, extreme atrocity or cruelty and felony murder), assault by means of a dangerous weapon, armed robbery and armed home invasion. S.A. 91-92, 791 & n.1. (Wadlington was acquitted of the assault with intent to murder charge). S.A. 791 n.1. The judge sentenced Wadlington to a life sentence on the murder conviction and terms of years, to be served concurrently, on the other convictions. S.A. 92.

### D. Wadlington's Motion for New Trial and Appeal

In his motion for new trial and then in his direct appeal to the Supreme Judicial Court (a consolidated appeal of his conviction and denial of his motion for new trial, S.A. 92), Wadlington made numerous claims: (1) that the Commonwealth failed to provide timely exculpatory evidence regarding Fields' recanted statement about where the trio had traveled prior to arriving at Busby's apartment; (2) that the fruits of a search of his girlfriend's residence should have been suppressed where the affidavit in support of the search warrant included information from Fields that he later recanted; (3) that the trial judge erred in not suppressing Wadlington's custodial statements to police; (4) that the trial judge erred in failing to find that there was insufficient evidence of the armed robbery; (5) that the trial judge failed to instruct the jury that it must unanimously agree as to which of the two targets was the victim; (6) that it was error to allow certain testimony by the Commonwealth's fingerprint expert; (7) that a substantial likelihood of a miscarriage of justice arose from the prosecutor's improper statements during opening and closing statements; (8) that the judge relieved the prosecution of its burden of proving a necessary element by instructing the jury that the crimes of armed robbery and home invasion are "inherently dangerous to human life as a matter of law"; (9) that the judge failed to instruct the jury that they must unanimously agree on the predicate felony; and (10) that he received ineffective assistance of counsel because his trial

counsel failed to seek reconsideration of the denial of the motions to suppress, to request a unanimity instruction and to move to strike the government fingerprint expert's comments. S.A. 790-91.

The trial judge denied the motion for a new trial. S.A. 107. Wadlington appealed the denial of the motion, which was consolidated into his direct appeal, to the Supreme Judicial Court. The Supreme Judicial Court addressed each of Wadlington's claims and affirmed the convictions and the denial of the motion for new trial. S.A. 800.

## IV. Procedural History

Wadlington filed the Petition, raising the claims addressed by the Supreme Judicial Court. D. 1. Wadlington filed an amended petition on May 24, 2016, D. 32, pursuant to this Court's order granting the government's motion for a more definite statement, D. 17.

This Court has already granted the government's motion to dismiss in part as to Wadlington's sixth claim, regarding the trial testimony of the government's fingerprint expert, finding that the claim was not exhausted in state court, D. 47, but now addresses the remaining grounds for the Petition.

## V. Discussion

### A. There was no *Brady* Violation

Wadlington claims his constitutional rights were violated because the prosecution did not give defense counsel notice of the change in Fields' statement. D. 73 at 1. Wadlington argues that, because the prosecution heavily relied on Fields' false statement, the prosecution had a duty to disclose this exculpatory change. Id. at 4-5. Wadlington additionally claims that this information was not disclosed until a day before trial. Id. at 4. This argument fails for two reasons:

the Supreme Judicial Court reasonably found that the government had timely disclosed the change and, even if there was a delay, it did not result in prejudice. S.A. 795-96.

This Court, in reviewing a habeas petition, must presume the accuracy of factual findings made in state court unless the petitioner has rebutted this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As explained above, the Supreme Judicial Court concluded that the record before the trial court showed that, rather than waiting to inform Wadlington's attorney of the change in Fields' testimony, the Commonwealth sent the videotape recording of Fields' changed testimony to Wadlington's attorney within one month of recording it. S.A 795. Additionally, the Commonwealth reminded defense counsel of this receipt a few months later, approximately six weeks before trial. S.A. 796. While Wadlington alleges that his counsel was surprised by the change in testimony, this allegation is unconvincing given that Wadlington's attorney admitted that he had received a copy of the videotape before trial. <u>See</u> T. Tr. IV: 21. Additionally, in a hearing on a motion to quash a subpoena issued by defense counsel for Fields, the Commonwealth asserted that Wadlington's counsel had received the videotape containing Fields' changed statements and his counsel did not refute this statement. S.A. 98. Wadlington has presented no evidence, much less clear and convincing evidence, that supports his contention that the state court erred in making its factual determination that defense counsel had received the new statement in a timely manner.

Moreover, even if there was a delay in handing over this evidence, there was no prejudice to Wadlington. A <u>Brady</u> violation, pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), occurs when "[t]he evidence at issue must be favorable to the accused, . . . that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Stickler v. Greene</u>, 527 U.S. 263, 282 (1999). Here, the Supreme Judicial Court determined that

there was no prejudice because Wadlington's counsel made "extensive and effective use of the prior inconsistency at trial in his cross-examination of Fields." S.A. 796. This finding is supported by defense counsel's cross-examination of Fields. <u>See</u> T. Tr. IV: 88-89. Thus, the last prong of the federal standard under <u>Brady</u>, that the suppression result in prejudice, remains unmet. For all of these reasons, this ground does not entitle Wadlington to habeas relief.

### B. Reliance Upon Fields' Original Statement to Police for the Search Warrant Affidavit Did Not Violate the Fourth Amendment

Wadlington claims that his Fourth Amendment rights were violated because the police relied upon Fields' statement, which he later recanted, as part of the probable cause to obtain the search warrant. D. 73 at 7. This claim is barred from federal review because "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at this trial." <u>Stone v. Powell</u>, 428 U.S. 465, 482 (1976). "So long as a state prisoner has had an opportunity to litigate his Fourth Amendment claims by means of such a set of procedures, a federal habeas court lacks the authority, under Stone, to second-guess the accuracy of the state court's resolution of those claims." <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 8 (1st Cir. 2001). Because Wadlington argued his claim before the trial court and, ultimately, the Supreme Judicial Court, he had the opportunity to fully and fairly litigation this claim, and thus it is not the place of this Court to question that ruling.

Even if this claim were not so barred, it would fail on its merits, as the Supreme Judicial Court did not unreasonably apply federal law. As the Supreme Judicial Court correctly noted, so long as the affiant seeking a search warrant does not intentionally, knowingly or recklessly use false statements as probable cause to procure a search warrant, the warrant is not invalid due to the presence of inaccurate information in the supporting affidavit. <u>Franks v. Delaware</u>, 438 U.S. 154,

155-56 (1978). For a search warrant to be voided and fruits of a search to be deemed inadmissible, Wadlington must "show that the affiant in fact made a false statement or omission 'knowingly and intentionally, or with reckless disregard for the truth.'" United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013). In Wadlington's case, the Supreme Judicial Court reasonably found that the police officer did not intentionally misstate facts as he had no reason to doubt the veracity of Fields' statement at the time of his attestation in the affidavit, S.A. 796, particularly where Wadlington has presented no facts that suggest intentional or reckless deceit on behalf of the affiant.

Lastly, even without the affiant's reliance on Fields' original statement tying the sawed-off shotgun to the New Bedford residence, the affidavit contained ample evidence supporting probable cause to search this location. The affiant recounted, among other things, information from others witnesses that Wadlington lived at this residence and Wadlington's name was on the mailbox. S.A. 797. Lastly, the affidavit contained sufficient information not only that Wadlington lived at the residence before his incarceration (on other charges), but also that there was probable cause to believe that there would be evidence there of the charged crimes. S.A. 797. Accordingly, this ground in the Petition does not warrant habeas relief.

### C. Wadlington Made a Knowing and Voluntary Waiver of *Miranda* Rights and Voluntary Statements Thereafter

Wadlington claims that he did not knowingly and intelligently waive his Miranda rights because he was misled by the last instruction from the police, given as part of their Miranda warnings, that tied his right to stop questioning at any time to his right to consult an attorney. D. 73 at 13. Further, Wadlington claims that his statements made to the officers were involuntary, evidenced by the fact that he refused to sign the portion of the consent form indicating that he had not been coerced into speaking with the police. D. 73 at 15.

The Supreme Judicial Court held that Wadlington's Miranda waiver was knowingly and voluntarily and his subsequent statements to the police were made voluntarily. S.A. 795. The court based its conclusion with regard to the waiver on the grounds that Wadlington was given both oral and written notice of his Miranda rights. S.A. 794-95. The Supreme Judicial Court also concluded that Wadlington's statements were voluntary as he demonstrated his understanding of his right to end the interview and spoke with police because he "hoped to learn what they were investigating" and to "persuade them that he was innocent." S.A. 795. Wadlington only invoked his right to be silent after he found out his girlfriend had not corroborated his story.

The Supreme Judicial Court reasonably applied federal law when ruling on this claim. The determination of the validity of a Miranda waiver is a two-part analysis: the waiver must be made voluntarily, meaning it "was the product of free and deliberate choice rather than intimidation, coercion, or deception," and it must be made knowingly, meaning it was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). Both the determination of voluntariness and knowing are made in light of the totality of the circumstances surrounding the waiver. Id. Moreover, any statements following a valid waiver must be made voluntarily. See Spano v. New York, 360 U.S. 315, 324 (1959).

First, the totality of the circumstances suggest that Wadlington's Miranda waiver was made voluntarily. The facts, as affirmed by the Supreme Judicial Court, do not reveal any conduct that would have overcome Wadlington's will with regard to waiving his Miranda rights. S.A. 795. While Wadlington did not sign the part of the form that formally indicated that he had not been coerced into meeting with the officers against his will, this is only one factor among all the circumstances and, by itself, does not require a finding of involuntary waiver. Rather, the Supreme

14

Judicial Court reasonably concluded that Wadlington voluntarily waived his <u>Miranda</u> rights for self-serving purposes, namely that he wanted to learn what the officers were investigating, S.A. 795, and this was so despite the "misleading warning" about the so-called fifth <u>Miranda</u> right to terminate questioning. <u>Id.</u>

Secondly, the totality of circumstances also indicates that the waiver was made knowingly. At multiple points, Wadlington made his understanding of the <u>Miranda</u> warnings clear. He acknowledged his right to end the interview by saying, "One thing I do know. I am going to walk out of here; I am not worried about whatever you do to me." S.A. 795. He also acknowledged his right to not speak with the officers at all multiple times throughout the interview. For example, at the beginning of the interview, he indicated he understood his right not to speak with investigators, "but said he wanted to know what was 'going on.'" S.A. 795. Additionally, "[i]n the first one-third of the interview, before he invoked his right to silence, [Wadlington] said, 'I don't want to get up and leave because I am trying to figure out what the Hell is going on.'" S.A. 795. Given these statements, this Court finds that the Supreme Judicial Court reasonably concluded that the Miranda waiver was made knowingly.

Next, the Supreme Judicial Court did not unreasonably apply federal law in holding that the statements following the waiver were voluntary. The relevant inquiry is whether, in giving the statements, Wadlington's will had been "overborne." <u>Spano</u>, 360 U.S. at 323. The Supreme Judicial Court ruled that Wadlington's statements to police were "an attempt to persuade them that he was innocent and had nothing to do with the armed robbery or the homicide." S.A. 795. As such, this Court cannot say that the Supreme Judicial Court ruling on this issue was an unreasonable application of federal law because the totality of circumstances suggest that Wadlington's waiver and subsequent statements were made knowingly and voluntarily.

**D.  Under** <u>There Was Sufficient Evidence to Support the Conviction of Armed Robbery</u>

While Wadlington admits that he, Fields, and Cole planned to rob a drug dealer, he contends that there was insufficient evidence that an armed robbery actually took place.  D. 73 at 17.  While Santos was found with his pockets out and there was evidence of a struggle which involved weapons, Wadlington argues that there was no evidence that anything had actually been taken from the scene.  <u>See</u> D. 73 at 18.  Wadlington supports his argument by stating that "[c]ocaine and bags of rock like substance on the kitchen floor w[h]ere Santos was found had not been taken." <u>Id.</u>  The Supreme Judicial Court concluded that "[t]here was more than sufficient evidence that [Wadlington] and his joint venturers were armed when they entered the targeted residence, that their purpose was to rob the occupants of drugs and money, and that, at a minimum, they stole a samurai sword during the course of the robbery."  S.A. 798-99.

"[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 316 (1979).  The relevant test is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>O'Laughlin v. O'Brien</u>, 568 F.3d 287, 299 (1st Cir. 2009) (quoting <u>Jackson</u>, 443 U.S. at 319) (emphasis in original).  Reviewing courts may not set aside a verdict on sufficiency grounds unless "no rational trier of fact could have agreed with the jury."  <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011).  It is not enough that the federal reviewing court disagrees with the jury's ultimate verdict; for reversal to be proper, the state court decision must be "objectively unreasonable."  <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010).

The elements the prosecution needed to prove beyond a reasonable doubt as to the armed robbery charge were: 1) that Wadlington or one of his co-venturers "[took] money or other property from the victim with the intent to steal it, while armed with a dangerous weapon and by applying actual force to the victim or putting the victim in fear through the use of threatening words or gestures." Commonwealth v. Benitez, 464 Mass. 686, 693 n.12 (2013); Mass. Gen. L. c. 265, § 17. Given the testimony at trial, a jury could have reasonably concluded that Wadlington was armed when he entered Busby's home with the others with the intent to rob the occupants. First, Busby testified that, on the night of the crime, someone he did not recognize knocked on the door. T. Tr. II: 99. To get a better look, he asked the person to step back a little so he could open the door; when he opened the door, Busby said that "whoever was sitting on the set of stairs came rushing in with the gun, the rifle, went past [him]." T. Tr. II: 99. Additionally, Busby testified that, after obtaining the cellar key, he heard someone say "It's only a 22" and, shortly after, a gunshot. T. Tr. II: 108-09. Fields' testimony also supported a finding that Wadlington was armed when the robbery took place. Fields testified that, before driving to Busby's apartment, Fields, Wadlington and Cole drove to a residence where Wadlington retrieved a gun. T. Tr. IV: 41-42.

Next, a jury could have reasonably found that something had been stolen from the scene of the crime. Busby testified that, upon hearing men "torturing [his] boy for the keys for the cellar," he retrieved his samurai sword. T. Tr. II: 104. Fields later testified that, when he saw Cole a couple days after the robbery, Cole had the samurai sword in the trunk of his Chevy Lumina. T. Tr. IV: 64. The Supreme Judicial Court reasonably concluded that the government presented sufficient evidence that Wadlington was guilty of the robbery since Wadlington was Cole's co-venturer and as such is implicated in Cole's taking of the sword. Thus, habeas relief is also not warranted on this ground.

### E. Wadlington's Claim Regarding the Unanimity Instruction is Procedurally Defaulted and Does Not Warrant Habeas Relief

Wadlington claims that his constitutional rights were violated when the trial judge did not give an unanimity instruction with regard to the victim of the armed robbery. D. 73 at 20. Wadlington contends that, because some jurors may have found him guilty of the armed robbery of Santos and other jurors may have found him guilty of the armed robbery of Busby, the final verdict may not have been unanimous, as Wadlington contends is constitutionally required. D. 73 at 22.

This claim fails because it is procedurally barred. The Supreme Judicial Court concluded that Wadlington neither requested an unanimity instruction nor objected to its absence. See Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2010); S.A. 799. Even if this claim were not so barred, the state court's denial of same was based on Massachusetts law, and "[f]ederal courts sitting in habeas must accept state court rulings on state law issues" since any "inquiry into the correctness of a ruling on state law issues 'is no part of a federal court's habeas review of a state conviction.'" Rodriguez v. Spencer, 412 F.3d 29, 37 (1st Cir. 2005) (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)). Specifically, the Supreme Judicial Court found that the unanimity instruction was not required on two separate state law grounds. First, Massachusetts law does not require a specific unanimity instruction where evidence demonstrates "a continuing course of conduct . . . rather than clearly detached incidents." S.A. 799 (quoting Commonwealth v. Santos, 440 Mass. 281, 285 (2003)). Here, the Supreme Judicial Court concluded that the conduct during the crimes were part of such a continuing course of conduct, rather than separate incidents. S.A. 799. In other words, the Supreme Judicial Court was satisfied that the jury unanimously found the defendant guilty of armed robbery on the single occasion alleged, which is what is required under Massachusetts law. See Santos, 440 Mass. at 285. Second, the Supreme Judicial Court held that

"both Busby and Santos were properly identified as victims of the armed robbery in the indictment because each had 'some protective concern with respect to the property taken' and the property was taken from both victims' 'person or presence.'" S.A. 799 (quoting <u>Commonwealth v. Levia</u>, 385 Mass. 345, 351 (1982)). For all of these reasons, Wadlington is not entitled to habeas relief on this ground.

### F. Prosecutor's Opening Statement and Closing Argument Do Not Merit the Relief Wadlington Seeks

Wadlington claims, in essence, that he was denied due process as a result of misstatements regarding DNA evidence and fingerprint analysis made by the prosecution during its opening statement and closing argument. D. 73 at 29. Wadlington argues that the prosecutor improperly injected her personal belief regarding the defendant's guilt and appealed to the sympathy of the jury by stating, "[t]hat is what really happened ladies and gentlemen. We know [Wadlington] didn't find the drugs down there because they were still down there on the 26th. . . . [Wadlington] and Cole were very mad. And the Cole [sic] and [Wadlington] shot his friend and left 19-year-old Rudolph Santos to die on the floor." <u>Id.</u> at 31-32. Wadlington contends these are improper statements as there was no evidence that the blood collected from the stain in the cellar was his blood and because the prosecution did not tell the jury that the fingerprint testimony only constituted an opinion. <u>Id.</u> at 29.

As an initial matter, this claim is also procedurally defaulted. Wadlington did not object either to the prosecutor's opening statement or closing argument. S.A. 799. Against this backdrop, the Supreme Judicial Court noted that, even if defense counsel had done so, it would not have mattered, as "[n]othing in the prosecutor's opening statement or closing argument created a substantial likelihood of a miscarriage of justice," S.A. 799, the heightened state standard that applies to unpreserved objections.

Even if this claim was not procedurally defaulted, for constitutional analysis, the "relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The prosecution's assertions in the opening statement regarding the analysis done on both the blood and palm print were grounded in evidence later introduced at trial. See Kirwan v. Spencer, 631 F.3d 582, 588-89 (1st Cir. 2011) (holding that when statements and inferences given in opening statements are grounded in evidence, they will not be considered as violating a defendant's due process rights). Here, Amy Joy, a DNA analyst who performed the comparison analysis for Wadlington's case and testified at trial, opined that the DNA profile of Wadlington was "consistent with the DNA profile of the swab of red brown drop from the cellar stairs." T. Tr. VI: 91. Sergeant Kerri Gilpin, a fingerprint expert with the Massachusetts State Police Department, opined at trial that the print found in the cellar matched Wadlington's print. T. Tr. IV: 195. Because the prosecution's opening statements were grounded in evidence later introduced, this Court cannot say that the prosecutor's statements amounted to a denial of due process.

The same is true with the closing argument. Wadlington specifically takes issue with the fact that the Commonwealth stated, "[w]e have the DNA, ladies and gentlemen." D. 73 at 31; S.A. 740. However, the Commonwealth adequately talked through the process by which the DNA tests were conducted, using statements that were supported by witness testimony was offered during trial. S.A. 741.

Lastly, Wadlington takes issue with the Commonwealth's statement that "Santos was left to die on the floor." S.A. 739. This statement, however, does not rise to the level of a due process violation. See Darden, 477 U.S. at 180-81 (holding that comments, including the prosecutor's

opinion on the defendant's guilt and a statement that the perpetrator of the crime was an "animal," did not infringe on defendant's due process rights); see also Donnelly, 416 U.S. at 644 (holding that prosecutor's remark implying that respondent offered to plead guilty did not violate due process, especially considering that it was followed by a disapproving curative instruction). To the extent that anything about this statement suggested personal knowledge on the part of the prosecutor, the trial court addressed same with a curative instruction. Despite Wadlington's counsel not objecting to the prosecutor's closing arguments, see T. Tr. VIII: 52, before the judge gave his full jury instructions, he stated that he "want[ed] to clear one thing up, just as a matter of wording." Id. The judge then instructed the jury:

> "I know during the Commonwealth's argument there was [an assertion] . . . that a certain person was a certain person, and we know what they were looking for and we know something else, . . . and the Commonwealth is not suggesting that the district attorney has any personal knowledge of this case, that's really semantics. The Commonwealth is suggesting what she claims the evidence establishes, and that's the evidence presented in this courtroom, the evidence you heard. You shouldn't infer that there's some other knowledge beyond anything that was presented in this courtroom. . . . It's for you to evaluate the evidence and for you to draw such conclusions as you see fit."

S.A. 740 (quoting T. Tr. VIII: 52-53). Given this curative instruction, coupled with the general instruction that opening statement and closing arguments were not evidence, S.A. 104, and because "jurors are normally presumed to follow the trial court's instructions," United States v. Sampson, 486 F.3d 13, 39 (1st Cir. 2007), the Court does not conclude that this ground warrants habeas relief.

## G. Jury Instructions on Felony Murder Do Not Warrant Habeas Relief

Wadlington claims that the judge's instructions on the elements of felony murder relieved the Commonwealth of its duty to prove an element of felony murder, thus violating Wadlington's Sixth Amendment rights. Specifically, Wadlington contends that the jury was denied the ability

to decide whether armed robbery or armed home invasion were crime "inherently dangerous to human life" where the trial judge instructed the jury that, as a matter of law, the felonies of armed robbery and armed home invasion are felonies which are "inherently dangerous to human life." S.A. 800.

The state court, however, resolved this issue as a matter of Massachusetts law regarding felony murder. At the time relevant to this decision, Massachusetts law designated "the elements of felony murder [as] (1) an unlawful killing, (2) committed in the course of a felony, and (3) the defendant committed the felony with a conscious disregard for human life." Mello v. DiPaulo, 295 F.3d 137, 149 (1st Cir. 2002) (citing Commonwealth v. Prater, 431 Mass. 86, 95 (2000)).[4] Massachusetts courts have designated multiple felonies that "as a matter of law, may support a conviction of felony-murder" as they replace the "need to show a 'conscious disregard for human life because the risk is implicit in the intent required for the felony.'" Commonwealth v. Tevlin, 433 Mass. 305, 314 (2001) (quoting Commonwealth v. Scott, 428 Mass. 362, 364 (1998)). Therefore, under Massachusetts law, it was not erroneous for the judge to rule as a matter of law that felonies of armed robbery and armed home invasions were inherently dangerous to human life.

As discussed above, habeas courts "must accept state court rulings on state law issues." Rodriguez v. Spencer, 412 F.3d 29, 37 (1st Cir. 2005). Ultimately, this claim was based on a state court ruling regarding state law. It is unavailing now that Wadlington attempts to cast this claim in a constitutional light. See Cruz v. Maloney, 152 F. App'x 1, 4 (1st Cir. 2005) (denying habeas

---

[4]The law has changed prospectively as to felony-murder under Massachusetts law, Commonwealth v. Brown, 477 Mass. 805, 807 (2017), but that new rule does not apply retrospectively to Wadlington's 2010 conviction. Id. (holding that "in trials that commence after the date of the opinion in this case, a defendant may not be convicted of murder without proof of one of the three prongs of malice").

relief on the grounds that jury instructions relieved Commonwealth of its duty to establish all necessary elements of a crime when Petitioner's claim ignored well-established Massachusetts precedent and had been decided by the Supreme Judicial Court on the basis of state law). Wadlington's argument ignores well-settled Massachusetts precedent which provides that the determination of whether a felony is "inherently dangerous to human life" is a matter of law, not one of fact. Thus, the trial judge properly instructed the jury as to the elements of a felony-murder under Massachusetts law at that time and did not relieve the prosecution of their burden of proof. Habeas relief is, therefore, denied on this ground.

### H. Lack of Unanimity Instruction for Underlying Felony for Felony Murder Conviction Did Not Violate Wadlington's Constitutional Rights

Wadlington claims that his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial judge did not give a specific unanimity instruction with regard to which underlying crime served as the basis for felony murder conviction. The jury was instructed to find Wadlington guilty of felony murder if it found that the murder occurred during the commission of either armed robbery or armed home invasion but did not specify that the jurors had to be unanimous as to which felony it was. D. 73 at 39.

The Supreme Judicial Court agreed with Wadlington that such an instruction was necessary because, when felony murder is at issue, the jury must agree as to the underlying felony. S.A. 799. The Supreme Judicial Court, however, ultimately declined his appeal on this claim because the absence of the instruction created no prejudice as the jury ultimately convicted Wadlington on both underlying felonies, thus ensuring that "the jury unanimously found beyond a reasonable doubt that the defendant committed both of [the] felonies." S.A. 800. Additionally, even if Wadlington's argument had merit, the Supreme Judicial Court ruled that the murder conviction would still stand

"because the defendant was also convicted of this crime on the theories of deliberate premeditation and extreme atrocity or cruelty." S.A. 800.

In Brecht v. Abrahamson, the Supreme Court held that habeas petitioners are not entitled to relief based on trial error unless they can establish it resulted in actual prejudice. Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). Under this standard, habeas relief is only proper if a "federal court has 'grave doubt about whether a trial error' . . . had substantial and injurious effect or influence in determining the jury's verdict." Id. at 623. Here, the test is not satisfied, as this Court finds no injurious effect on the verdict as a result of the mistaken jury instructions. This is because the jury would certainly have reached the same conclusion, that Wadlington was guilty of felony murder, even with proper instruction, as Wadlington was ultimately convicted of both underlying felonies.

## I. There Was No Ineffective Assistance of Counsel

Lastly, Wadlington claims that his Sixth Amendment rights were violated as a result of ineffective assistance of counsel. D. 73 at 41. He argues his counsel was ineffective in failing to: (1) seek reconsideration of motions to suppress, (2) request an unanimity instruction and (3) move to strike the fingerprint expert's comments on Wadlington's guilt.

In his appeal, the Supreme Judicial Court noted that "[b]ecause his claim of ineffective assistance is based on defense counsel's failure to act appropriately to prevent some of the eight errors claimed on appeal or to preserve the defendant's rights regarding those alleged errors, we shall address this claim when we address the other claims." S.A. 791. The Supreme Judicial Court addressed the issue more directly was when it discussed the motion to suppress, noting that, "[e]ven if defense counsel failed timely to review the videotape and for that reason did not learn of Fields' recanted statement until the eve of trial, his failure did not render counsel effective

because, as the judge found and the record reflects, he made 'extensive and effective use of the prior inconsistency at trial in his cross-examination of Fields.'" S.A. 796. As to the other grounds on which Wadlington bases his ineffective assistance of counsel claims, the Supreme Judicial Court analyzed whether the line of action that Wadlington claims his attorney should have taken would have been meritorious, such that he was not prejudiced by these alleged failures. Concluding that they would not have been, the Supreme Judicial Court declined to overturn his conviction on such grounds. S.A. 796, 799.

An ineffective assistance of counsel claim requires Wadlington to demonstrate his "(1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" United States v. Constant, 814, F.3d 570, 578 (1st Cir. 2016) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)). Under the first prong, the Petitioner must show their counsel was "so inferior as to be objectively unreasonable" against the court's "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Bucuvalas v. United States, 98 F.3d 652, 658 (1st Cir. 1996) (citation and internal quotation mark omitted). Under the second prong, reasonable probability means "a probability sufficient to undermine confidence in the outcome." Argencourt v. United States, 78 F.3d 14, 16 (1st Cir. 1996) (quoting Strickland, 466 U.S. at 694).

Wadlington argues that his counsel failed to engage in an investigation of Fields' recanted statements underlying the search warrant and move to reconsider the denial of the motion to suppress. D. 73 at 42-43. This argument fails because, as explained above, Wadlington fails to demonstrate that a motion for reconsideration would have been meritorious given that the affiant understood that Fields' statement was accurate at the time the search warrant was sought and issued

and the Supreme Judicial Court's determination that there was sufficient evidence otherwise to support a finding of probable cause. Thus, the second prong of the <u>Strickland</u> test, that but for counsel's actions the outcome would have been different, is unfulfilled.

Wadlington also contends that his trial counsel was ineffective for both failing to seek reconsideration of the motion to suppress statements and request a humane practice instruction. D. 73 at 44-46. This claim is also unavailing as Wadlington has again not proven this line of defense would have been meritorious. The motion judge and the Supreme Judicial Court were "convinced beyond a reasonable doubt . . . [Wadlington's] statements were voluntary" before he invoked his right to silence. S.A. 795. Moreover, the Supreme Judicial Court determined that defense counsel's failure to request a humane practice instruction cannot constitute ineffective assistance of counsel because "the voluntariness of the defendant's statements was not a live issue at trial." S.A. 795. This fact is significant because a humane practice instruction is only required "where a defendant's statements are offered in evidence and the voluntariness of those statements is 'a live issue at trial.'" <u>Commonwealth v. Carter</u>, 475 Mass. 512, 523 (2016) (quoting <u>Commonwealth v. Tavares</u>, 385 Mass. 140, 150 (1982)). Given these findings, it cannot be said the Supreme Judicial Court's determination that Wadlington's counsel was not ineffective for failing to pursue reconsideration of the motions to suppress was an unreasonable application of <u>Strickland</u>.

Wadlington next claims that his counsel was ineffective for failing to request an unanimity instruction. Again, this argument fails because such a request would not have altered the outcome of the trial, as explained more fully above. Receiving an unanimity instruction with regard to the victim of the armed robbery would not have changed the outcome in the trial because, as the Supreme Judicial Court explained, "both Busby and Santos were properly identified as victims of

the armed robbery" and Massachusetts law does not require a specific unanimity instruction where evidence demonstrates "a continuing course of conduct . . . rather than clearly detached incidents." S.A. 799. Again, because it would not have affected the outcome, the Supreme Judicial Court properly applied the Strickland standard to this claim.

Wadlington also claims he received ineffective assistance of counsel because his trial counsel failed to move to strike the fingerprint expert's testimony, specifically that she "would never want to put an innocent person in jail." D. 73 at 48. Wadlington contends that this statement robbed the jury of the ability to come to their own conclusion regarding his guilt, free from an expert's opinion. D. 73 at 48. This claim, however, falls short of the Strickland standard as applied to habeas petitions, which requires "but for the ineffective assistance, the outcome of the case would have been different." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006). In this case, it cannot be said that but for the Gilpin's comment being struck that the outcome of the trial would have been different. Without repeating all of the evidence presented at the trial, even without the fingerprint testimony, there was substantial, inculpatory evidence against Wadlington. The Supreme Judicial Court, upon review, determined that this statement should have been struck from the record, but that its admission in the record "did not create a substantial likelihood of a miscarriage of justice." S.A. 798. The First Circuit has held that when the Supreme Judicial Court applies the "'substantial likelihood of a miscarriage of justice' standard, its decision will not be deemed to be 'contrary to' the Strickland criterion." Knight, 447 F.3d at 15 (quoting Mello, 295 F.3d at 144). That is, this Court does not conclude that even counsel erred in failing to move to strike this line of testimony, the result of the trial would have been different. As to the bases that Wadlington relies upon for his ineffective assistance of counsel claim, none of them support the granting of habeas relief.

## VI.     Conclusion and Certificate of Appealability

For the foregoing reasons, the Court DENIES the Petition.  Wadlington may receive a certificate of appealability only if he makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when "reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." Miller-El, 537 U.S. at 338 (internal quotations omitted).  Based upon the analysis of the record and the applicable law in this Memorandum and Order, the Court is not, at this juncture, inclined to issue a certificate of appealability, but will give Wadlington until February 25, 2019 to file a memorandum, not to exceed five (5) pages, if he seeks to address the issue of whether a certificate of appealability is warranted as to any of the grounds in the Petition.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge